**KOPLAR (SHARAF et al., Interveners) v. WARNER BROS. PICTURES, Inc., et al.**

**No. 977.**

District Court, D. Delaware.

March 9, 1937.

174

Clarence A. Southerland (of Ward & Gray), and Aaron Finger (of Richards, Layton & Finger), both of Wilmington, Del., Ernest L. Wilkinson, Walter G. Moyle, and Ernest H. Oliver, all of Washington, D. C., A. L. Pomerantz, of New York City, Milton Paulson, of Brooklyn, N. Y., and A. Marcus, of New York City, for plaintiff and interveners.

William G. Mahaffy and Herbert L. Cohen, both of Wilmington, Del., and Joseph M. Proskauer and J. Alvin Van Bergh, both of New York City, for defendants Warner.

Hugh M. Morris and Ivan Culbertson, both of Wilmington, Del., and Joseph H. Hazen, of New York City, for defendant Warner Bros., Inc.

Morris Wolf, of Philadelphia, Pa., in pro. per.

Reuben Satterthwaite, Jr. (of Satterthwaite & Foulk), of Wilmington, Del., for defendants Harold S. Bareford et al.

NIELDS, District Judge.

This is a derivative suit. It is essentially a suit by Warner Brothers Pictures, Inc., against its directors. These directors are charged with unlawfully issuing a large block of its common stock to Harry M. Warner, Albert Warner, and Jack Warner, three of its directors, and to Waddill Catchings, another director. In their amended bill of complaint plaintiffs charge:

"(9) During or about the month of December, 1928, the corporate defendant issued to the Warners, or to Renraw, Inc., a corporation owned and controlled by the Warners, 90,000 shares of the corporate defendant's common capital stock. The individual defendants, and particularly the Warners, participated in causing said stock to be issued. Said 90,000 shares of stock were pretended to have been issued in connection with a contract of employment then entered into between the corporate defendant and the Warners, or some corporation owned and controlled by them, but in fact constituted nothing more than a gift of said stock to the Warners. Under said contract of employment the corporate defendant was obligated to pay Ten Thousand Dollars ($10,000) per week for a period of six years for the services of the Warners, which salary provided exceedingly liberal and indeed excessive compensation for the services of the Warners. The issuance of said 90,000 shares of the corporate defendant's stock was without consideration and was not opposed by any of the individual defendants, as directors, but, on the contrary, was approved by them, and the Warners were the beneficiaries of said illegal issuance of stock. Said 90,000 shares of stock were also pretended to be issued by way of reimbursement to the Warners, to the extent of 50,000 shares thereof, of 50,000 shares of common capital stock of the corporate defendant alleged to have been turned into the treasury of the corporate defendant by the Warners in the year 1925, but there was no existing obligation, of any kind, on the part of the corporate defendant to the Warners, at the time of the issuance of said 90,000 shares, in connection with the alleged transfer of 50,000 shares from the Warners to the corporate defendant in 1925.

"(10) The plaintiff alleges that all of the individual defendants who participated in or approved the issuance of said 90,000 shares of stock are jointly and severally liable for the payment to the corporate defendant of the value of said 90,000 shares at the time of the issuance thereof, and that the Warners, who were the beneficiaries of the transaction, are particularly liable, jointly and severally, for the payment to the corporate defendant of the value of said 90,000 shares of stock at the time of the issuance thereof. Said 90,000 shares of stock at the time of the issu-ance thereof were worth about Twelve Million Dollars ($12,000,000)."

In legal effect plaintiffs allege that the issue of 90,000 shares of no-par value common stock is illegal for the following reasons: (1) Actions authorizing the transaction at all directors' meetings were illegal for want of a quorum. (2) Actions approving the transaction or the settlement thereof at all stockholders' meetings were illegal for want of a sufficient notice. (3) If any of said actions are legal, the transaction amounted to a waste of corporate assets and therefore is illegal.

In support of their position plaintiffs rely upon article 9, § 3, of the Constitution of the State of Delaware and section 14 of the Delaware Corporation Law (Rev. Code 1915, § 1928).

Article 9, § 3: "No corporation shall issue stock, except for money paid, labor done or personal property, or real estate or leases thereof actually acquired by such corporation."

Section 14: "Subscriptions to, or purchase of, the capital stock of any corporation organized or to be organized under any law of this State may be paid for, wholly or partly, by cash, by labor done, by personal property or by real property or leases thereof; and the stock so issued shall be declared and taken to be full paid stock and not liable to any further call, nor shall the holder thereof be liable for any further payments under the provisions of this Chapter. And in the absence of actual fraud in the transaction, the judgment of the Directors, as to the value of such labor, property, real estate or leases, shall be conclusive."

Renraw, Inc., was a personal corporation owned and controlled by the individual Warner Brothers. I shall refer throughout this opinion to the individual Warners and Renraw, Inc., as the "Brothers"; to Warner Brothers Pictures, Inc., as the "Company"; and to Goldman, Sachs & Co. and Waddill Catchings as "Catchings."

### Early days of Warner Brothers.

In 1906 four Warner Brothers as young partners started showing pictures in a store-room in New Castle, Pa. The room seated 100. The admission was 5 cents. They started with $200 capital. The pictures yielded a profit of about $300 a week. In 1907 they went to Pittsburgh and became distributors of pictures until they sold out. In 1912 they moved to New York and oper-

176

ated a national distributing agency in all the large cities. In seeking new capital they made bad connections and came to grief. In 1915 they started another distributing agency which prospered. In 1916 Sam and Jack Warner leased a small place in Hollywood and started production. Harry and Albert Warner arranged in New York for distribution of pictures. In 1917 they produced and distributed a picture from Gerard's "My Four Years in Germany" that yielded a profit to the Brothers of $130,000. They built a studio and office in Hollywood. They produced "Peck's Bad Boy," "Why Girls Leave Home," and many pictures appealing to the popular taste.

The partnership had been engaged in the production and distribution of silent motion pictures by means of a "Franchise system." In the spring of each year they announced the number, type, and titles of the pictures they planned to produce and to distribute from August in one year until August in the following year. "Franchise holders" negotiated for the right to distribute pictures in certain defined territory. The country was divided into 15 "exchange districts" with several franchise holders in each district. After competitive bids the partnership made arrangements with the franchise holders who agreed to advance to the partners a fixed amount on each picture plus a further advance when the pictures were delivered to the exchange. In consideration thereof the franchise holder obtained the exclusive right to distribute the pictures within his exchange territory. Out of the receipts from the distribution, the franchise holders deducted the advances made to the partners plus the cost of distribution and split the balance with the partners. This was the early method of financing their business. It was a very costly and burdensome method as is well illustrated in the picture "My Four Years in Germany." The Brothers interested a party to invest $50,000 to produce this picture and agreed to give him 50 per cent. of the profits. The venture was very successful as the Brothers paid over $150,000 to the party advancing the $50,000. Nearly $100,000 was paid to Gerard and approximately $300,000 to the distributors. The profit remaining for the Brothers was over $130,000. This was a lucky strike as many of the pictures were very costly to produce and were not nearly so profitable.

Capital Loans to the Company.

April 6, 1923, Warner Brothers Pictures, Inc., was incorporated with an authorized capital of 500,000 shares of no-par value common stock. On the same day the partners conveyed to the Company the entire business and received therefor 300,000 shares of common stock. The Brothers were the sole stockholders and continued the business. During the season of 1923–24 the Company produced and distributed through its franchise holders 20 pictures. This year the Company showed a profit of $249,365.62, and in the following year a profit of $1,001,950.

In February, 1925, the Company prepared to announce its pictures for the 1925–26 season. "Franchise holders" organized to dictate terms under which they would take the pictures. To escape from dependence on franchise holders the Company determined to organize its own exchange system by purchasing the Vitagraph Company of America, Inc. This company owned a system of exchanges in the United States and Canada with studios in Brooklyn and Hollywood. To finance the purchase the Company required additional capital. In March, 1925, the Company's general counsel interested the banking house of McClure, Jones & Reed who in turn interested Goldman, Sachs & Co. These bankers purchased 170,000 shares of newly created Class A stock and 30,000 shares of common stock, paying therefor $1,820,000 to the Company. The Company applied half of this money to the purchase of Vitagraph. The bankers required as a condition of the purchase two things: (1) Class A stock was to have preference over the common stock. (2) The Brothers should separately enter into contracts with the Company to devote their full time and effort to the service of the Company until at least March 1, 1930. In explaining the necessity of this negative covenant Catchings testified:

"In selling stock to the public we * * * encouraged the public to buy the stock in the belief that the management which had existed in the past and on the basis of which the sale was made would continue in the future, and we insisted upon the management making a contract with the company, so that we could be justified in making that representation."

The next step in the shift from distribution through franchise holders to direct

distribution through Vitagraph was the recapture of the franchises which the Company had granted. The outstanding franchise agreements could be terminated only by substantial cash payments. June 12, 1925, Catchings made available to the company a $3,000,000 revolving credit. This disposed of the franchise holders and was the first step to more permanent financing.

### Loans to Launch and Establish "Talkies."

In February, 1925, another important event occurred. The Brothers learned that the Bell laboratories had perfected apparatus for *talking* motion pictures. Harry Warner witnessed a demonstration in the Bell laboratory and realized its vast significance. Walter Rich had an option from Western Electric Company for the commercial development of talking picture apparatus. The Company acquired a half interest in the Rich contract. To finance this purchase Catchings persuaded bankers to underwrite the Company's $4,200,000 note issue. The purchaser of each $1,000 note received an option to receive at maturity $1,050 or $1,000 plus 7½ shares of Warner common stock. 50,000 shares of common stock was required to accomplish this financing—30,000 shares to cover the bonus accompanying the notes and 20,000 shares as compensation to the underwriters. The 50,000 shares of bonus stock was the price which the corporation had to pay for borrowing $4,200,000 for three years at 6½ per cent. These 50,000 shares were provided by the Brothers from their personal holdings. Catchings testified:

"In that situation I went to the Warners, to Harry Warner at first, and said that * * * in my opinion as a banker it was not feasible for the company to issue additional stock. * * *

"I told them the only way I could see for them to get the stock was for him and his brothers to make a contribution of the stock. * * * At the time I told them that as they were making a contribution in behalf of all the stockholders, and they were the only stockholders who were contributing, that whenever the company was able to return the stock to them, that I would do my utmost to see that it was done."

Subsequently when Catchings had become a member of the board he "stated to the directors at a board meeting the circumstances under which Mr. Warner was

contributing the stock, and that I hoped and expected, if the occasion arose, to return that stock to them if it could be done." He discussed this with every director of the Company and "they all said that if the opportunity presented, we would return the stock to the Warners which they had contributed."

Experiments in talking pictures progressed satisfactorily and on April 26, 1926, Western Electric Company granted an exclusive license to the Vitaphone Corporation whose stock was owned by the Warner Company and Rich. Vitaphone expended large sums in producing talking pictures which were first exhibited August 6, 1926, at the Warner theater on Broadway. Large amounts were required to continue production. The financial condition of the Company forbade loans. Catchings suggested that the Brothers loan the money. Thereafter for two years the Brothers furnished the following service or financial assistance to the Company, thus enabling it to create a market for talking pictures.

| | |
|---|---|
| Total cash advances to the Company | $6,222,774.43 |
| Total notes of Company purchased | $1,085,432.62 |
| Total of personal guarantees | $5,604,250.00 |

By August, 1928, the Company had succeeded in establishing talking motion pictures. Competitors had started production of talking motion pictures and would be able to supply the theaters. The Company had to enter the theater business or retire to a subordinate position. There was only one large chain of theaters not controlled by competitors. This was the Stanley Company of America with 350 theaters in New Jersey, Pennsylvania, Maryland, New York, and the District of Columbia. Stanley Company owned 33 per cent. of the capital stock of First National Pictures, Inc., one of the largest producing companies. Twenty-three per cent. of this stock was owned by other theater companies. To finance the Stanley and First National purchase, contracts were signed October 2, 1928, under which each share of Stanley stock would exchange for the following: 9/100 of a Warner common share plus 8/10 of a Warner Class A share plus $11.50 cash. $14,800,000 cash was required to complete the purchases. All this financing was necessary to enable the War-

ner Company to hold its share of the new talking motion picture business.

The financing was accomplished in the following way: (1) The Brothers undertook to retire Class A stock. (2) The Brothers were to loan the Company $1,775,000 to enable it to pay off the banks and to free collateral. (3) The Brothers were to convert their unsecured demand loans of $5,155,000 into a deferred loan. (4) The Brothers were to purchase the First National stock from the theater operators for $4,400,000 which the Warner Company was to repurchase. (5) Goldman, Sachs & Co. was to purchase 20 per cent. of the Warner stock received by the Stanley committee. (6) The Brothers were to loan Goldman, Sachs & Co. 50,000 shares of Warner common stock for four months and to bear a portion of the underwriting loss if any or were to receive the underwriting profit. (7) The Brothers were to enter into a negative covenant for a period of years not to become interested in a competing business.

The Brothers stated their willingness to enter into a long term employment contract and to serve the Company by affording the financial aid as above outlined provided their compensation for past and future services was fixed.

September 12, 1928, Catchings submitted the matter to a directors' meeting. The directors appointed a committee to negotiate with the Brothers a satisfactory contract. October 2, 1928, the exchange agreement between the Stanley committee and the Warner Company was signed. Under this agreement four Stanley directors were to be elected to the Warner board and the proposed employment agreement was submitted to these future directors. October 10, 1928, the employment agreement was submitted to the board and was approved subject to the consummation of the Stanley deal. December 3, 1928, the final form of the employment contract was approved by the board who authorized its execution. Delivery, however, was withheld until the Stanley agreement was concluded and until the Warner stockholders had approved.

### Stockholders' Meetings in December, 1928.

December 4, 1928, there was a special meeting of stockholders of the Company pursuant to a notice accompanied by a letter of Harry M. Warner, president of the Company, dated November 7, 1928. The stockholders were notified that a special meeting would be held to consider the exchange agreement dated October 2, 1928, between the Company and a committee of the Stanley Company; an amendment to the charter of the Company; the division of the board of directors into two classes; and "the contract for the services of the three Messrs. Warner." Accompanying this notice each stockholder received the president's letter, stating, inter alia:

"In order to assure to the combined companies the continued services of Messrs. H. M. Warner, Albert Warner and Jack L. Warner, the Board of Directors are recommending to the stockholders a contract providing for their services for six years, discharging certain obligations to them, and calling for compensation, in part, in Common Stock. Also, the Company's bankers, Messrs. Goldman, Sachs & Co. have agreed to accept Common Stock as compensation for the necessary underwriting and other services performed by them. In addition, the Board of Directors have authorized the purchase of a controlling interest in Skouras Bros. Enterprises, Inc., of St. Louis, and in the St. Louis Amusement Company, which acquisition will give your Company a predominant position in the moving picture exhibition field in St. Louis and an important position in Indianapolis. For these purposes, a total of 171,000 shares of Common Stock will be required. * * *

"As all of the foregoing matters are subject to the requisite action by the stockholders it becomes necessary for the consummation of this program to call a special meeting of the stockholders. You will find enclosed a notice calling that meeting for December 4, 1928 and also calling the annual meeting for December 10, 1928. The management is of the opinion that the program herein outlined is clearly for the best interests of our Company and urge that you promptly sign and return the enclosed proxy in the enclosed envelope."

At this special meeting of stockholders of December 4, 1928, the Warner employment contract, the Goldman, Sachs compensation, the purchase of the stock of Skouras Brothers Enterprises, Inc., and of St. Louis Amusement Company were submitted to the stockholders for their approval. The employment contract was

read to the meeting. The minutes recite that:

"The Chairman then presented to the meeting copies of the following contracts which with the approval of the Board of Directors had been entered into on behalf of the corporation:

"(A) An Agreement dated as of September 1, 1928 with Renraw, Inc. providing for the continued services of Messrs. H. M. Warner, Albert Warner and Jack L. Warner, for a period of six years, discharging certain obligations of the corporation to them and calling for compensation in part in Common Stock of this Corporation; and * * *

"Upon motion duly made and seconded, it was unanimously

"Resolved: That the execution on behalf of this Corporation of (a) the Agreement dated September 1, 1928 with Renraw, Inc. * * * be and it hereby is in all respects ratified, approved and confirmed."

The minutes also contain a resolution approving the underwriting agreement with Goldman, Sachs & Co. and their compensation in common stock.

The vote on these resolutions was:

| For | 344,839 shares |
|-----|----------------|
| Against | 0 shares |

At this time the Brothers owned directly and indirectly 61,639 shares out of 548,540 shares then outstanding. Significant parts of the employment contract calling, among other things, for the payment of $10,000 a week and delivery of 90,000 shares of common stock appear in the footnote.[1] The general outline of this employ-

---

[1] "Agreement made as of the 1st day of September, 1928, by and between Warner Bros. Pictures, Inc., a Delaware Corporation with a principal office at No. 321 West 44th Street, in the Borough of Manhattan, City of New York, hereinafter designated the 'Corporation,' party of the first part, and Renraw, Inc., a New York corporation with a principal office at No. 321 West 44th Street, in the Borough of Manhattan, City of New York, hereinafter designated as 'Renraw,' party of the second part.

"Witnesseth:

"Whereas Renraw, by virtue of a contract with Harry M. Warner, Albert Warner and Jack L. Warner, hereinafter sometimes collectively designated 'Warner Brothers,' is (subject to their present commitment to the Corporation) entitled to the sole and exclusive services of said Warner Brothers for a period of six (6) years from the date hereof, and is entitled further to dispose thereof upon the terms herein set forth, and

"Whereas said Warner Brothers now are and since the organization of the Corporation have been the chief executives thereof in all of its departments, have heretofore contributed fifty thousand (50,000) shares of the common capital stock of the Corporation to its Treasury, and have been and are responsible for its present position in the motion picture industry, and are possessed of unique and peculiar ability in the conduct of the various branches of said industry, and

"Whereas the said Corporation is desirous of assuring to itself the continuance of the services of Warner Brothers and/or their survivors, and recognizes, admits and agrees that the fair and reasonable market value of the services hereinafter agreed to be rendered by Warner Brothers and Renraw, Inc., and the value of the covenant in paragraph (1) hereof set forth, is the consideration hereinafter agreed to be paid, and

"Whereas Renraw has in the past loaned and advanced certain sums of money to the Corporation and the Corporation is now indebted to Renraw in the sum of $5,155,000, exclusive of interest accrued thereon subsequent to October 31st, 1928, evidenced by the unsecured promissory notes of the Corporation payable to the order of Renraw upon demand, and

"Whereas Renraw has made such loans and advances to the Corporation upon the terms hereinafter set forth,

"Now, Therefore, for and in consideration of the premises, of the mutual covenants hereinafter contained, of the contract of Guaranty hereto annexed, and of other good and valuable considerations, the receipt whereof is hereby mutually acknowledged, the parties hereto agree as follows:

"(1) Renraw agrees that Harry M. Warner, Albert Warner and Jack L. Warner will not, nor will any one or more of them at any time prior to the 31st day of August, 1934, engage in the motion picture business in any of its branches except as the agents, officers and/or employees of this Corporation and/or of its subsidiaries and affiliated and associated companies, or in any manner directly or indirectly compete

ment contract was indicated in the minutes of the board of directors of September 12, 1928:

"Mr. Rudkin referred to the services rendered by the three Warner Brothers in the past, not only in managing but in financing the corporation and to the sacrifices made by them for the benefit of the corporation. He strongly urged the desirability of entering into new contracts for a period of at least six (6) years with each of the Warner Brothers on terms mutually agreeable to them and to the corporation. Mr. Thomas stated that in view of the present gratifying condition of the corporation due chiefly to the efforts of Messrs. Warner and to the financial assistance that they have rendered to the company and would have to continue to render for some time to come that a sal-

ary of $10,000 a week for the three Warner Brothers, in addition to a very substantial additional stock interest would be an appropriate compensation in return for a covenant that they would not compete with the corporation in any manner during the term of their employment."

This contemporary minute shows that the 90,000 shares were, in part, consideration for services past and future and that those services included financial services rendered and to be rendered.

Following the recital clauses, the employment contract provides:

"Now Therefore, for and in consideration of the premises, of the mutual covenants hereinafter contained, of the contract of Guaranty hereto annexed, and of other good and valuable considerations, the re-

with the said corporation or with any of its subsidiaries or affiliated or associated companies.

"(2) Within ten days after the present authorized common capital stock of the Corporation shall have been increased and such increased common capital stock listed upon the New York Stock Exchange, the Corporation agrees to issue and deliver to Renraw or to such other person, firm or corporation as may be designated by Renraw, fifteen thousand (15;000) shares of the common stock of the Corporation fully paid and non-assessable. The certificates representing such stock shall be in one hundred share lots and shall be issued and registered in the name of Renraw, or in the name of such other person, firm or corporation as may be designated by Renraw. Furthermore, and in addition thereto, and within ten days after the present authorized common capital stock of the Corporation shall have been increased and such increased common capital stock listed upon the New York Stock Exchange, the Corporation agrees to issue and deliver to The Manufacturers Trust Company in the City of New York, as depositary, seventy-five thousand (75,000) shares of the common capital stock of the Corporation fully paid and non-assessable, to be held by it subject to the terms hereof. The certificates representing the said shares of stock shall be in one hundred share lots and shall be issued and registered in the name of said depositary. The said depositary shall deliver certificates representing fifteen thousand (15,000) shares of the said common stock of the Corporation to Renraw, or to any person, firm or corporation designated by Renraw in writing, upon the first day of October, 1929, and a like amount of fifteen thousand (15,000) shares upon the first days of October in the years 1930, 1931, 1932, and 1933, respectively. Upon such delivery such certificates shall be endorsed by the said depositary in blank and shall be in good form for transfer. Such delivery of the certificates representing the said shares of stock by the said depositary to Renraw, or to its nominee or nominees, shall in no wise be affected by or in any degree conditioned upon the performance or the failure of performance of any of the terms and conditions of this agreement or upon the doing of any act or thing or upon the happening of any event, or upon the life, death or disability of any or all of the Warner Brothers, other than a breach of the covenant set forth in paragraph (1) hereof, and until and unless it shall have been finally determined that there has been a breach of the said covenant so set forth in paragraph (1) hereof Renraw and/or its successors in interest shall be entitled to receive delivery of the said stock certificates in the manner, upon the dates and to the extent indicated, and shall be entitled also, pending the delivery thereof and throughout the period when such stock is so deposited, to have and enjoy all of the incidents of the ownership thereof, including the right to vote the said stock (and to this end the depositary shall make and deliver its proxy to Renraw or to the nominee of Renraw upon the written request of Renraw), the right to receive cash dividends and the right to subscribe to additional stock or other securities, subject only to being divest-

ceipt whereof is hereby mutually acknowledged, the parties hereto agree as follows."

The true consideration for a contract may always be shown by parol evidence provided there is no contradiction of the executory covenants contained in the contract. In the instant case parol evidence—that the past extraordinary financial services of the Brothers were in part consideration for the compensation agreed to be paid to them—in no way contradicts any of the executory covenants of the contract. The oral proof and the contemporary minutes of the board of directors are corroborative of the recitals of the contract. What was intended by the employment contract may be stated in these few words—all the things done and to be done by the Brothers, on the one hand, were to be considerations for all the things to be done by the corporation on the other hand. This was the broad intent, however the draftsman of the contract may have fumbled in using language limiting the consideration. As the true consideration for a contract may be shown by parol, it is perfectly apparent from all the evidence that the major consideration for the delivery of the 90,000 shares of common stock was the past and future financial aid of the Warner Brothers to the Warner Company.

In any event the interpretation of the employment contract does not determine the issues in this case. Those issues are solved by the conduct of the parties to the employment contract and of the other defendants during the succeeding seven years.

Pursuant to the notice and letter of November 7, 1928, the annual meeting of stockholders was held on December 10,

---

ed of such ownership in the event of its being finally determined, pursuant to the provisions hereof that the said covenant, so contained in paragraph (1) hereof, has been breached. Any cash dividends upon the said stock received by the depositary shall be promptly paid to Renraw by the depositary and all notices in regard to such stock shall be promptly forwarded. All additional stock received by the depositary as stock dividends, or upon a split-up of shares then held by it hereunder, shall be held by the depositary and delivered pro rata to Renraw as the stock with respect to which such dividend or 'split-up' was received, is deliverable on October 1st in the years 1929, to 1933 inclusive, and shall then be delivered. The Corporation shall pay the fees charged and disbursements of the depositary. * * *

"(4) The Corporation hereby releases Harry M. Warner, Albert Warner and Jack L. Warner from their existing employment contracts with it, dated March 7th, 1925 and expiring March 1st, 1930, and it employs and engages of and from Renraw, Harry M. Warner, Albert Warner and Jack L. Warner, and their survivor or survivors, who are to do and perform, during the life of this agreement, (to wit, the six year period to end August 31st, 1934) such services as may be assigned to them, or to their survivor or survivors, by the Board of Directors of the Corporation, which services shall be of a nature and character consistent with the duties of the positions and offices in the Corporation now and for a long time past filled by them, consistent with the services now and for the past two years performed by them and the compensation to be paid hereunder, and Renraw agrees that Harry M. Warner, Albert Warner and Jack L. Warner will perform such services during the term agreed upon; provided, however, that the said Jack L. Warner shall be at all times the General Manager of Production in full charge of the Corporation's studios and of the production of all motion pictures and other entertainments produced by it, throughout the life of this agreement except in the event of his death or resignation or physical incapacity.

"(5) The Corporation further agrees to pay to Renraw for such services of Warner Brothers, their survivor or survivors, the sum of $10,000, each week for a period of six (6) years commencing as of the 1st day of September, 1928 and ending on the 31st day of August, 1934. Provided, however, that in the event of the death or resignation of any one of said Warner Brothers during the life of this agreement, then from and after the date of his death or resignation, the Compensation payable to Renraw hereunder shall be reduced by the amount of $3,333.33 per week. In the event of the death or resignation of a second one of the Warner Brothers during the life of this agreement, then from and after the date of his death or resignation, the compensation payable to Renraw hereunder shall be by the like amount of $3,333.33 per week, and in the event of the death or resignation of all of the three brothers during the life of this agreement, the compensation provided to be paid to Renraw in this paragraph (5) hereof shall cease and terminate. The obligations of this para-

1928. At this meeting all actions of the board of directors were ratified, approved, and confirmed. The three Warner brothers, Rudkin and Catchings were re-elected to the board of directors together with the four nominees of the Stanley committee. These representatives of the Stanley stockholders approved the employment contract before its execution and continued that approval as members of the board of directors of the Company.

At this stage it may be appropriate to observe that we are dealing with extraordinary events in extraordinary times. The Warner Brothers were pioneers in the "talkies." Their contribution to the revolution in the theatrical business from silent movies to "talkies" was vital. Western Electric Company and others devised the apparatus and the Warner Brothers were the first to successfully use the apparatus and to reconcile the public to the change. Their plan of financing their business through bank credits instead of advances from franchise holders was a move involving millions. Their acquisition of a great chain of theaters to use their films was a step involving more millions. To keep abreast of the march of time demanded extraordinary and heroic efforts.

December 10, 1928, application was made to the New York Stock Exchange to list additional shares of stock of the Warner Company. The application also stated:

"In addition to the foregoing, in order to assure to the Corporation and to the stockholders of Stanley Company of America the continued services of Messrs. Harry M. Warner, Albert Warner and Jack L.

graph (5) hereof with respect to the payment of compensation to Renraw by the Corporation may be in part assigned to and assumed by any subsidiary of the Corporation or to and by any corporation affiliated with this Corporation, but nothing herein contained and no such assignment or assumption shall be construed as a release of this Corporation from the performance of all of the terms and conditions of this paragraph (5) hereof and of this entire agreement, except to the extent that the consideration herein agreed to be paid shall actually be paid by such subsidiary or subsidiaries or affiliated company. This agreement and the obligations hereof shall be assumed and performed by any corporation with which the Corporation is consolidated or merged. * * *

"(7) In the event of the physical incapacity of any one or more of the said Warner Brothers to perform his or their respective duties hereunder, by reason of ill health or otherwise, for a period in excess of three months in any one year of this agreement (said year to be deemed to extend from September 1st of one year to August 31st of the following year) the Corporation is hereby given the option to reduce the compensation agreed to be paid to Renraw, under the provisions of paragraph (5) hereof, by the amount of $3,333.33 for each week during the balance of said year that each of said Warner Brothers is so incapacitated.

"(8) Any breach or default on the part of Renraw shall not be deemed so material as to effect the termination of this contract but Renraw shall be and remain liable for the actual damages suffered by the Corporation by reason of such breach or default.

"(12) This agreement whenever signed and executed shall not become effective unless and until a certain agreement between the Corporation and the Committee of Stockholders of the Stanley Company of American involving the acquisition by the Corporation of not less than 460,000 shares of the capital stock of the Stanley Company of America, shall have been consummated by the purchase and acquisition of the said capital stock of the Stanley Company of America.

"In Witness Whereof the party of the first part has caused this instrument to be executed in its corporate name by the Chairman of its Finance Committee and its seal to be affixed and attested by its Secretary, pursuant to the resolution of its Board of Directors, a copy of which is hereto annexed, and the party of the second part has caused this instrument to be executed by its President and its corporate seal to be affixed and attested by its Assistant Secretary, the day and year first above written.

"Warner Bros. Pictures, Inc.
"By [Signed] Waddill Catchings
"Chairman of the Finance Committee
"Attest:
"[Signed] Abel Cary Thomas
"Secretary
"Renraw, Inc.
"By [Signed] H. M. Warner
"President
"Attest:
"[Signed] Harold Bareford
"Assistant Secretary."

Warner and to provide for the deferment of the maturity of the indebtedness of this Corporation to Renraw, Inc., in excess of $5,000,000, a contract dated as of September 1, 1928 has been entered into with Renraw, Inc., providing, among other things, for the services of the three Messrs. Warner for six years, extending the payment of the indebtedness over a period of years, and calling for the issue of 90,-000 shares of Common Stock as part consideration."

During the years 1929, 1930, and 1931 not a single stockholder voted against the re-election of the Warner slate of directors. Not a single stockholder ever complained of the employment contract so long as the company was making money. In the fiscal year ending August 31, 1929, the net profits were $17,271,805. For the six months ending March 1, 1930, the net profits were $10,092,109. For the fiscal year ending August 30, 1930, the net profits were $7,074,621, despite the fact that the last half of that fiscal year showed a net operating loss of $3,000,000. Thereafter as the depression deepened the Company's losses increased. Throughout the depression the Brothers continued to loan the Company substantial amounts.

### Senate Investigation in 1932.

In the spring of 1932 the Senate Committee on Banking began an investigation of various stock market practices. May 21, 1932, Harry Warner testified before the committee. May 22, 1932, the newspapers throughout the United States carried front page stories of the Warner salaries and stock transactions.

June 1, 1932, ten days after the Senate investigation and four years after the transactions complained of, Harry Koplar filed the original bill in this suit charging many fraudulent transactions and seeking the appointment of a receiver of the Company. These charges were subsequently abandoned and the present amended bill was filed.

### Goldberg Letters to Stockholders.

In the fall of 1932, another dissatisfied stockholder began to circularize the stockholders of the Company. October 29, 1932, Max Goldberg, an attorney of Salem, Mass., "having invested what is to me a substantial sum of money in its common stock," mailed letters to stockholders soliciting proxies for the annual meeting to be held December 12, 1932. In this letter he said:

"Having met with complete denial of information by the company I was determined to make a personal search of all the facts that I could find concerning the company and its management. I went to Wilmington, Delaware, to investigate a suit brought by Harry Koplar, a stockholder, against the company and the individual directors based upon alleged mismanagement and the resulting losses, which suit was pending in the United States District Court for the District of Delaware. I was amazed at the astounding nature of the allegations which were made by the plaintiff in this suit against the company and its directors.

"The allegations of the Bill of Complaint filed in this suit were based upon a great many transactions of the company, such as the acquisition of many properties, music publishing houses, radio companies, theatres, a lithographing business and about two hundred other subsidiary companies, also the matter of salaries to the officers and some relatives and favorites of the officers. The allegations also dealt with the payment of 100,000 shares of common stock by the company to Harry M. Warner, Albert Warner and Jack L. Warner in January 1929, of the then value of approximately $13,000,000. The Bill of Complaint also included many other allegations concerning many other matters too numerous to touch upon in the limited space of this letter. All matters are of great and vital concern to the stockholders. * * *

"The Board of Directors is composed of the three Warner Brothers, their lawyers and friends. They no longer deserve the confidence of the stockholders and a new Board of Directors can be elected only if the stockholders organize and oust the present Board of Directors. It must be done for the welfare of the company.

"The company is to have its annual meeting some time in December at which time directors are to be elected. A change in the directorate is absolutely necessary for the best interests of the common stockholder. Now is the time to organize!"

Goldberg and his counsel attended the annual meeting in Delaware on December 12, 1932. The meeting lasted three full days and was given the widest newspaper publicity. During the meeting opportunity was given to all stockholders to criticize

184

the transactions here challenged. The minutes of the meeting show that there was a bitter discussion about the compensation in cash and in stock paid to the Warner Brothers and to Goldman, Sachs & Co.

At the conclusion of the meeting Goldberg presented a resolution containing a resolve to the following effect: That the Brothers pay to the Company $10,000,000, the alleged market value of the 90,000 shares of stock issued under the employment contract.

The resolution was defeated by the following vote:

Against the resolution    1,934,415 shares
For the resolution        30,666 shares

At this time the Brothers owned directly and indirectly 295,861 shares out of 3,801,344 shares then outstanding.

At this meeting John P. Laffey of Wilmington and Charles S. Guggenheimer of Guggenheimer & Untermyer were elected directors to investigate the merit of these suits.

At the next annual meeting of the stockholders on December 11, 1933, Laffey reported to the stockholders:

"I desire to say before we start to our Wilmington friends, who like myself were purchasers of stock, that a year ago tomorrow I was by request elected a director of this company. * * * Meetings were held monthly. I have attended every meeting except one, and I have paid close attention to the business that was transacted there. The reason that I accepted this assignment, this nomination, was because of my personal interest in the company and because of what I call wild charges that were made with reference to irregularity and mismanagement and a lot more things, which you have all probably heard. I want to assure you on my personal responsibility and my personal honor, I have lived among you for thirty years or more, that at those meetings nothing has been done or suggested by the Warners or by anybody that is not entirely proper and regular in every respect. * * * I want to say in addition that my reason for accepting this assignment on the board was to find out as near as I could the truth about the matter, as to whether there was any ground for these charges of mismanagement or irregularity. I found none."

The report of the Federal Trade Commission on the compensation received by the Brothers was given nation-wide publicity. This report was made to the president of the Senate, February 26, 1934. It shows that a salary of $520,000 was paid to the Warner Brothers in 1929; that a like amount was paid to them in 1930; that $486,916 in salary was paid in 1931; that $376,497 in salary was paid in 1932; and that $280,575 in salary was paid to them in 1933.

### Settlement of 1935.

The cause of complaint, if any, against the defendants in this suit was fully and completely settled in 1935. The employment contract expired by its terms in September, 1934. The directors realized that any disruption in the continuity of management by the Brothers would have very serious consequences to the Company and urged the Brothers to enter into a new contract of employment. The Brothers took the position that they had been unjustifiably attacked and refused to sign a new contract. The board of directors with a view of determining the propriety of settling all controversies between the Company and its three principal officers appointed a committee of directors consisting of Messrs. Charles Guggenheimer, Morris Wolf, and Stanleigh P. Friedman "to retain counsel to investigate and make recommendations with reference to certain law suits to which this corporation is a party." These three men had not been on the board at the time the employment contract had been authorized in 1928. The committee retained as counsel the firm of Davis, Polk, Wardwell, Gardner & Reed. The committee submitted to that firm a statement of facts annexed to which were all material documents relating to the employment contract. The firm reported to the board that in their opinion it was for the best interest of the company to effect a settlement. Thereupon the board authorized the firm to negotiate with counsel for the Brothers.

May 13 and 21, 1935, the representative of the Davis firm reported to the board of directors that he had reached a tentative agreement with counsel for the Brothers whereby the Brothers should deliver to the Company 100,000 shares of common stock of the Company and should execute and deliver to the Company a release for any cash compensation which had not been paid under the employment contract. The minutes recite:

"A full discussion was then had of all the legal aspects involved in the proposed settlement. * * *

"Mr. Catchings stated to the meeting that he had originally participated in negotiations and voted for the contract of September 1, 1928, and that he was of the opinion then and is still of the opinion that the contract was fair and proper and that it had been fully performed. However, in view of the vexatious litigation and the desire of the parties to settle and compromise all disputes relating to the contract, and in further view of the letter opinion of counsel, he would vote for the resolution. * * *

"Mr. Guggenheimer stated that a trial would consume a great amount of time, with at best a doubtful result to the corporation. That after reading the opinion letter of Davis, Polk, Wardwell, Gardner & Reed, and for general business reasons, the settlement should be made.

"Mr. Wolf stated that in his opinion the continued existence of a dispute of the nature involved between the corporation and its principal executive officers created an intolerable situation and should be terminated. He would vote for the resolution."

Thereupon the board authorized the execution of the settlement agreement dated May 21, 1935, by which (1) the Brothers transferred to the corporation 100,000 shares of its common stock; (2) the Brothers released .to the corporation any claim which they might have to $680,177.46, representing the amount of the cash compensation to them under the employment contract which had not been paid by the Company; and (3) the mutual exchange of releases between the Company and the Brothers.

A quorum of the board could be had only by counting some directors alleged to be interested. Guggenheimer, Wolf, Friedman, Carlisle, and Catchings were five of the seven directors who voted for this settlement. The directors submitted the settlement to the stockholders for approval. The stockholders were asked to approve or disapprove the settlement. They were not asked to ratify the action of the directors.

The above settlement apparently was fair in view of the following facts: Liability was denied. Recovery was doubtful. The amount was not liquidated. The cost of litigation would be large. Time would be wasted and morale destroyed. The continuance of litigation against the principal executives would be very harmful to the Company.

To remove any taint arising from interest on the part of directors the approval of the stockholders was sought. The next stockholders' meeting was the annual meeting of December 9, 1935. At annual meetings notice of the subjects to be considered are usually not required. In this instance, however, express notice was given. The notice calling the annual meeting and the letter accompanying the notice, both dated October 25, 1935, gave the stockholders adequate and sufficient notice concerning the settlement. The notice and accompanying letter are set out in hæc verba in the footnote.[2]

---

[2] Notice Of Annual Meeting of Stockholders

New York, N. Y., October 25, 1935

To the Stockholders of Warner Bros. Pictures, Inc:

Notice Is Hereby Given that the annual meeting of the stockholders of Warner Bros. Pictures, Inc., will be held at the principal office of the Corporation at 100 West 10th Street, Wilmington, Delaware, on December 9th, 1935, at 11 o'clock in the forenoon, for the following purposes:

(1) The election by the holders of preferred stock of six directors, constituting a majority in number of the Board of Directors, for a term of two years. Pursuant to the provisions of the Certificate of Incorporation, the entire voting power for the election of a majority of the Board of Directors is at present vested in the preferred stock.

(2) Approving the Compromise and Settlement Agreement between the Corporation and Renraw, Inc., Harry M. Warner, Albert Warner and Jack L. Warner entered into on the 21st day of May, 1935, whereunder the said parties compromised and settled all disputes and controversies between them based upon, related to and/or arising out of a contract between them dated as of September 1st, 1928, and the amendments and modifications thereof. For further information concerning the aforesaid compromise and settlement, you are referred to the letter of even date addressed to the stockholders by the Board of Directors, enclosed herewith.

(3) The consideration and transaction of such other business as may properly come before the meeting.

These communications gave express notice to stockholders of the following: (1) The pendency of suits against the Brothers and others arising out of the 1928 employment contract. (2) The substance of the terms of the employment contract. (3) That Davis, Polk, Wardwell, Gardiner & Reed had been employed as independent counsel to advise the Company as to whether or not a settlement of the claims against the Brothers would be proper. (4) The full terms of the settlement including the delivery of 100,000 shares of common stock and the exchange of mutual releases. (5) That the Goldberg suit had been discontinued after settlement. (6) That other suits had been brought and were still pending. (7) That proxies to be voted in approval of the settlement were solicited.

Plaintiffs' attorneys claim there was no settlement because this notice of the annual meeting of stockholders failed to reveal (1) that the Brothers had received a salary of $10,000 per week; (2) that the 50,000 shares delivered to the Warner Brothers in 1928 was then worth $10,400,-000; (3) that dividends had been paid on the 50,000 shares; (4) that the majority of the directors in 1928 authorizing the employment contract were interested; (5) that the Davis firm was furnishing an opinion respecting the propriety of accepting a settlement; (6) that the firm did not recommend settlement "after full consideration of all the facts"; and (7) that the firm regarded the claim of the Company as of "considerable merit."

■■ For seven years the propriety of the employment contract had been agitated by the stockholders, by public bodies and in the public press. Notice of an annual meeting need not contain a specification of the details of the business to be considered. With the knowledge gathered through the period of agitation and with the express notice of the matters to be considered as above outlined the stockholders were adequately and sufficiently informed. A technical elaboration of the information contained in the notice and accompanying let-

Stockholders of record at the close of business October 30, 1935, will be entitled to vote at such annual meeting.

Abel Cary Thomas,
Secretary.

New York, N. Y., October 25, 1935.

To the Stockholders of Warner Bros. Pictures, Inc.

There is enclosed herewith a Notice of the Annual Meeting of Stockholders called for the 9th day of December, 1935, at the principal office of the Corporation at 100 West 10th Street, Wilmington, Delaware.

At this meeting six directors, constituting a majority of the Board of Directors, are to be elected by the preferred stockholders. Pursuant to the provisions of the Certificate of Incorporation, the voting power for the election of a majority of the Board of Directors is at present vested in the preferred stock. The directors whose terms of office now expire, are: Harry M. Warner, Albert Warner, Jack L. Warner, Abel Cary Thomas, Waddill Catchings and Henry A. Rudkin.

The Board of Directors will also ask you to approve their action in compromising and settling all controversies between the Corporation on the one hand, and Renraw, Inc., Harry M. Warner, Albert Warner and Jack L. Warner on the other, arising out of or relating to an agreement between the parties dated as of September 1, 1928, and its amendments and modifications (hereinafter referred to as "the employment contract").

The employment contract, under which the Messrs. Warner have performed their services for the period of six years, provided, among other things, for a weekly cash salary, and for the issuance of 90,000 shares of the Corporation's common stock which was delivered in instalments during the term of the contract. The Corporation, in June, 1929, split each share of its common stock into two shares.

Minority stockholders' suits had been instituted for the alleged benefit of the Corporation, against Messrs. Warner and Renraw, Inc., and several of the directors, in which suits, among other things, certain legal questions were raised and liabilities asserted by reason of the making and performance of the employment contract.

The Board of Directors, believing that the continuance of a controversy between the Corporation and the Messrs. Warner, its principal officers, arising out of the employment contract was detrimental to the best interests of the Corporation, sought the advice of the law firm of Davis, Polk, Wardwell, Gardiner and Reed, of New York City, which law firm had never previously represented or advised the Corporation or Messrs. Warner or Renraw, Inc. This law firm after full consideration of all the facts submitted to them, recommended that the Corporation, if possible, negotiate a

ter of October 25, 1935, was unnecessary. These communications read in the light of surrounding circumstances were sufficient.

The stockholders knew at the time of the receipt of this notice and at the time of the meeting held December 9, 1935, that the Brothers were members of the board of directors which had approved the settlement; that a majority of the board of directors were officers of the Company; that the Brothers were the principal executives of the Company; that seven of the eleven directors, to wit, the Brothers, Catchings, Rudkins, Thomas, and Morris had been directors during the latter part of 1928 when the employment contract was authorized and pursuant to which 90,-000 shares of stock had been delivered. There was no concealment either in the notice calling the stockholders meeting of December 9, 1935, or at such stockholders' meeting.

At this annual meeting of December 9, 1935, the following documents were read in extenso: The resolution of the Board of Directors passed on May 13 and 21, 1935; the agreement of settlement of May 21, 1935; and the mutual releases given thereunder. These documents were submitted for inspection. Thereupon full discussion of the settlement took place. Everything done by the Brothers, by the board of directors, by the officers, by the committee of three, and the opinion of the Davis firm were attacked by attorneys for certain stockholders including the plaintiffs. A resolution approving the settlement was passed by the following vote:

| | |
|---|---:|
| Common stock in favor of the Resolution | 2,140,450 shares |
| Common stock against the Resolution | 4,400 shares |
| Preferred stock in favor of Resolution | 80,769 shares |
| Preferred stock against the Resolution | 0 shares |

settlement of all claims arising out of the employment contract. Upon receipt of this recommendation and after due consideration, the Board of Directors authorized Messrs. Davis, Polk, Wardwell, Gardiner and Reed to negotiate the settlement advised by them.

The Messrs. Warner and Renraw, Inc., at all times have steadfastly denied any liability on their part. However, they also recognized the desirability of reaching an accord with the Corporation in respect to the controversies arising out of the employment contract and therefore consented to negotiate a compromise and settlement thereof.

The settlement as finally negotiated provided (1) that Messrs. Warner and Renraw, Inc. deliver to the Corporation 100,000 shares of its common stock, (2) that the Messrs. Warner and Renraw, Inc., release the Corporation from all claims based upon, related to or arising out of the employment contract, including all claims against the Corporation by reason of the non-payment of part of the cash compensation payable to them under the employment contract, (3) that the Corporation release the Messrs. Warner and Renraw, Inc., from all claims based upon, related to or arising out of the employment contract, and (4) that the Messrs. Warner and Renraw, Inc. pay the costs and expenses of the plaintiff, Max Goldberg, in his minority stockholder's suit. This settlement has been fully executed, and such stockholder's suit has been discontinued, since which time, however, additional suits of a similar nature have been brought.

The Board of Directors believes the settlement to be advantageous and to the best interests of the Corporation and recommends your approval thereof.

In the event that you do not find it possible to be present in person at the meeting, will you kindly execute the enclosed proxy and return it at your earliest convenience. The persons who have been named to act as your proxies were designated by the Board of Directors, who solicit your proxy on behalf of the management of the Corporation.

It is the intention of the holders of the enclosed proxies of preferred stockholders to vote for the election as directors of those persons nominated by the management of the Corporation, and the intention of the holders of the enclosed proxies of both preferred and common stockholders to vote for the approval of the action of the Board of Directors in compromising and settling, as aforesaid, the controversy between the Corporation, and Renraw, Inc., and the Messrs. Warner, and to transact such further business as may properly come before the meeting.

By Order of the Board of Directors

Abel Cary Thomas,
Secretary.

Enclosures:
Notice of Meeting.
Proxy.

The preferred stock vote was advisory only. At this time the Brothers owned 227,579 shares of common stock out of 3,701,344. All negative votes were cast by attorneys for plaintiffs as their proxies.

The 100,000 shares of common stock were delivered and the $680,177.46 of back pay was released by the Brothers to the Warner Company pursuant to the terms of the settlement. This adjustment was a complete satisfaction of any claim of the corporation against the defendants growing out of the employment contract.

■ Assuming that the employment contract was authorized, plaintiffs contend that the compensation to the Brothers was so excessive as to amount to a waste of corporate assets. The court finds under all the circumstances of this case that the payment to the Brothers of $10,000 per week and 90,000 shares of common stock did not constitute a waste of corporate assets. In view of the character of the personal services and of the financial assistance, past and future, rendered by the Brothers, the payment was not excessive and did not amount to waste. Salaries of $10,000 a week are matched by salaries paid other top executives in this business. As a matter of morals such payments may be questioned. Directors have the power to award just compensation. That power should be used, not abused. Fair human requirements should set some limits to salaries. Extraordinary talent is not acquired. If it were, it would not be extraordinary. Doubtless it is an endowment which the holder should not place on the auction block.

■ On the first day of the trial plaintiffs requested permission to amend the bill of complaint in order to charge the unlawful issuance of 50,000 shares of common stock to Goldman, Sachs & Co., in 1928. In 1925, Goldman, Sachs was asked to assume the financial leadership in the development of the Warner Company. Waddill Catchings, a partner of that firm, made an investigation of the Warner Company and of its management. He convinced his associates that the business methods of the Company were sound and that the business had great possibilities. It is undisputed that through the combined efforts of Goldman, Sachs and of the Warners the Company was changed from an inadequately financed company in 1925 to a position where it was enabled to maintain itself as a leader in the talking motion picture industry. The services rendered by Goldman, Sachs covered two periods: (1) From 1925 to the middle of 1928 in securing capital for the Company and in the development of talking motion pictures; and (2) services from the middle of 1928 until the end of that year in underwriting and consummating the Stanley deal. The Warner Company would have been unable to acquire the Stanley and First National stock without the financial aid and assistance of Goldman, Sachs and of the Warners. The services theretofore rendered by the banking house and the services rendered by it in connection with the Stanley exchange were extremely valuable. For example, these bankers agreed on October 2, 1928, to raise $10,407,500 for the Stanley exchange. Without their services the Warner Company would have been unable to develop talking motion pictures and to have attained the position of a great national picture company. For these extraordinary services the compensation of 50,000 shares of no-par value common stock was fully justified. The payment was authorized by the board of directors and approved by the stockholders and was fully warranted under all the facts and circumstances of this case.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½ (28 U.S.C.A. following section 723).

The bill of complaint must be dismissed.