McQUILLEN et al. v. NATIONAL CASH REGISTER CO. et al.

No. 2274.

District Court, D. Maryland.

May 4, 1939.

Arthur Berenson, of Boston, Mass., and Samuel J. Fisher, of Baltimore, Md., for plaintiffs.

Piper, Watkins & Avirett (by James Piper and R. Dorsey Watkins), of Baltimore, Md., for National Cash Register Co.

Marbury, Gosnell & Williams (by William L. Marbury, Jr., and William L. Rawls), of Baltimore, Md., for Edward A. Deeds, Ezra M. Kuhns, Stanley C. Allyn, J. H. Barringer, and William Hartman.

Bartlett, Poe & Claggett (by J. Kemp Bartlett, Jr.), of Baltimore, Md., for Lee Warren James.

WILLIAM C. COLEMAN, District Judge.

This is a minority stockholders' suit against the National Cash Register Company and other defendants, originally fourteen in number, by which it is sought to have this Court declare null and void (1) an issue of stock by the company, and (2) an option given to Edward A. Deeds, chairman of its board of directors and executive committee, for the purchase of certain of the company's shares, in consideration of his services to the company.

This court has already rendered two written opinions in this proceeding, in addition to its rulings upon various motions. On December 14th, 1935, it was decided that since the National Cash Register Company is a Maryland corporation, this court had jurisdiction in rem to entertain the suit because the company's property, represented by certificates of stock, has a situs within the Maryland district, that is to say, at the corporation's domicile, which is, therefore, the appropriate place to settle disputes over the legality of the issuance of such stock; and that thus the provisions of Section 57 of the Judicial Code (28 U.S.C.A. § 118), providing for substituted service upon non-resident defendants in suits to remove any encumbrance, lien or cloud upon title to real or personal property, cognizable by the District Court in the district in which such property is situated, were applicable. See D.C., 13 F. Supp. 53. Again, on March 17th, 1938, this Court, following a hearing on various motions presented by defendants, some to dismiss the bill of complaint, as amended, in its entirety, and others to dismiss portions of it, decided that whereas the motions should be sustained with respect to the major portion of the allegations of the amended bill of complaint, nevertheless, plaintiffs were entitled to be heard on the merits with respect to that part of it which related to the two corporate acts above referred to. See 22 F.Supp. 867. The present opinion contains the Court's findings of fact and conclusions of law with respect to these two matters, a large amount of testimony having been taken, both in open court and by deposition, and extensive arguments of counsel having been heard, accompanied by the submission of briefs.

As already stated, originally, there were fifteen defendants, including the company, but in the course of the. litigation, this court dismissed the suit for want of jurisdiction as to all defendants except the company and five individuals—S. C. Allyn, J. H. Barringer,. Edward A. Deeds, William Hartman and Ezra M. Kuhns, who appear specially and only for the purpose of protecting the interests which they may have in any property within the Maryland District, pursuant to this court's prior decisions.

For the sake of clarity, this opinion will be divided into two sections. In the first, we will deal with the contested stock issuance, i. e. the issuance of 200,000 shares of stock known as "C" stock, in exchange for the 400,000 "B" shares outstanding; in the second, we will deal with the contested option to defendant Deeds.

### Issuance and Exchange of the "C" Shares.

Since, in its opinion of March 17th, 1938, this Court dealt at considerable length with the details of the original capitalization and recapitalization of the National Cash Register Company, a repetition of many of these details may be here omitted. Suffice it to repeat, by way of introduction

to the plaintiffs' claim to the effect that this stock transaction was irregular and invalid, that the National Cash Register Company was incorporated in January, 1926, with two classes of stock, "A" preferred, with an authorized issuance of 1,-100,000 shares, and "B" preferred, with an authorized issue of 400,000 shares, both of these classes of stock being of no par value. By the company's charter, the "A" shares carried cumulative dividends of $3 per share, while the "B" shares carried a dividend of like amount but non-cumulative. Upon dissolution or payment of dividends in excess of $3 per share, the "A" and "B" shares were to be placed on a parity. The "A" and "B" stock had equal voting rights per share except for the election of directors, in which case the "B" shares had the right to elect a majority and the "A" a minority, so long as the company was not in default in the payment of two quarterly dividends on the "A" stock, or the net earnings for the previous fiscal year amounted to $3 per share of "A" stock. While any such default existed, each share of stock of each class had equal voting rights for directors. The corporate action of which the plaintiffs complain was taken at a special meeting of the stockholders of the company, duly called by the board of directors and held on December 15th, 1932. At that time the unpaid dividends on the company's "A" stock had accumulated to an exceedingly large amount, namely, $5,801,-250, no dividends having been paid since the fall of 1931, due to the economic depression. At this meeting, it was voted by the combined vote of the holders of more than two-thirds of the shares of the "A" stock and "B" stock outstanding and entitled to vote, considered as a single class, to do the following three things: (1) To reduce the amount of issued capital stock from $42,000,000 to $24,420,000, and to authorize the filing of articles of reduction; (2) to amend articles 5th and 6th of the company's charter so as to authorize the issuance of 200,000 shares of "C" stock, with the same rights as to dividends, distribution on dissolution and voting rights as the "A" shares carried, this new stock to be issued in exchange for "B" stock at the rate of one share of "C" for 2 shares of "B" stock; and (3) to issue 238,000 new shares of "A" stock to the holders of record of "A" stock, pro rata, as a split-up.

The plaintiffs, by reason of trusteeships, owned at the time this suit was brought (July, 1934) and still own, 100 "A" shares of the company, for which they paid approximately $8000 in 1928 and 1929. In June, 1934, these shares had a market value of about $1,600, so plaintiffs claim they have lost about 80% of the cost price of the stock, regardless of dividend loss.

Briefly summarized, the gist of plaintiffs' claim of irregularity and illegality on the part of the defendants may be divided into three parts: (1) That the plan of this recapitalization was conceived in iniquity and unfairness to the "A" stockholders in that the company, through its officers and directors who owned or controlled the "B" shares, and less than two-thirds of the "A" shares, illegally dominated and brought about the issuance of the "C" shares, and their exchange for the "B" shares, thereby giving the "B" shareholders rights to which they were not entitled, and thereby in turn depriving the "A" shareholders of their rights; (2) that the votes of stockholders requisite for the accomplishment of these results was lacking at the meeting; and (3) that the documents essential to a lawful amendment of the charter, in order to accomplish these results, were irregularly executed.

The Court has reached the conclusion that there is no merit whatsoever in any of these contentions. For the purpose of presenting its reasons in as succinct a manner as possible, it will be helpful to consider the questions presented under the three following headings, in sequence: (1) The corporate action taken; (2) how it was taken; and (3) the authority by statute and charter to take it.

*The corporate action taken.* A statement of the three purposes of the special meeting of stockholders called for December 15th, 1932, has already been given. This meeting was called pursuant to action of the board of directors on November 18th, 1932. Under date of November 19th, 1932, a formal notice was sent to all stockholders of record, accompanied by a letter to which was appended a consolidated balance sheet of the company as of September 30th, 1932, and which contained the following statement:

"The plan, and its effects upon the outstanding Common A Stock and Common B Stock, may be summarized as follows:

"Common A. Stock. The 1,190,000 shares of A stock now outstanding [including 90,000 shares issued for subsequently acquired property] would be in-

creased by 238,000 shares (20%), distributed as a split-up pro rata among the holders of the present A stock. A new class of stock would be authorized as Common C, entitled to the same rights per share as the A stock with respect to distributions on liquidation, voting and dividends, including dividends per share equal to dividends declared per share on the A stock as arrears. Arrears on the A stock now aggregate $5,801,250. The C stock would be authorized in the amount of 200,000 shares, all of which would be issuable in exchange for the 400,000 outstanding shares of B stock. Upon the completion of such exchange, and the retirement of all of the B stock, the A and C stocks would become and constitute a single class of Common Stock, entitled to elect all of the directors of the Company under all conditions.

"Common B. Stock. Holders of B stock who exchange such stock for C stock would surrender their right to participate in the election, under the conditions outlined below, of a majority of the directors; such holders would receive one-half share of C stock for each share of B stock, and would suffer a further diminution of their interest in the equity, in event of liquidation, through the 20% distribution on the A stock. Such holders, however, as the holders of C stock, would be entitled to receive dividends on such stock equal per share to any amounts paid on the A stock, without waiting for the payment of arrears in dividends on the A stock or for the curing of the deficiency in earnings, as set forth below.

"Of the total of 1,590,000 shares of A and B stocks now outstanding, the A shares represent about 75% (the A shares having preference as to dividends). After the distribution of 20% in A stock, however, and the retirement of all of the B stock through exchange for C stock, total shares then outstanding would be 1,628,000, of which the A shares would represent about 87% and C shares (having rights equal to the A shares) the remainder.

"In connection with the foregoing, certain provisions of the charter are pertinent, which provisions may be summarized as follows:

"The A stock is entitled to preferential cumulative dividends of $3 per share per annum, before any dividend on the B stock. Subject to this prior right, the B stock is entitled to non-cumulative dividends of $3 per share in any year. Both classes of stock participate equally share for share in additional dividends in any year. The A and B stocks participate equally share for share in distribution of assets in liquidation.

"The A and B stocks have equal voting rights except that the B stock has a right to elect a majority of the directors, and the A stock has the right to elect the remaining directors, unless at the time of election two quarterly preferential dividends on the A stock are in arrears, or unless earnings for a preceding fiscal year have been less than $3 per share on the A stock and such deficiency has not been made good by subsequent excess earnings, in each of which cases the A and B stocks vote equally share for share in the election of directors.

"Preferential dividends on the A stock are now in arrears, and there exists also a deficiency in earnings as defined in the charter; and by virtue of the above charter provisions, the Directors now in office were elected by the combined vote of the A and B stocks, voting as a single class. Directors will continue to be so elected, under the present provisions of the charter, until the arrears are made up and the deficiency in earnings has been cured. Thereupon, the right to elect a majority of the directors will revert to the holders of the B stock. But with the retirement of the B stock, the above charter provisions would, of course, become inapplicable, and the A and C stocks (reconstituted as Common Stock), voting as one class, would elect all directors under all conditions.

"In addition to the foregoing changes in the capital stock of the Company, the Directors propose and recommend that the capital of the Company, represented by its stock without par value, be reduced from $42,213,335 to $24,420,000. This reduction of $17,793,355, which will not affect any stockholders' proportionate interest in the assets of the Company, will be transferred from capital account to capital surplus. A substantial portion of such capital surplus will be utilized in connection with certain adjustments in the Company's books,—namely, adjustments to reduce the book value of certain assets, to set up certain reserves, and to restore to earned surplus certain amounts formerly deducted therefrom; the effect of the latter would be to change earned surplus from a deficit to a credit. All such adjustments have

been approved by Messrs. Price, Waterhouse & Co."

*How the corporate action was taken.* As already stated, at the meeting there was a vote in favor of all of the proposed action, by the combined vote of the holders of more than two-thirds of the shares of the "A" stock and the "B" stock outstanding and entitled to vote, considered as a single class. Plaintiffs attempt to make much of the fact that in the articles of amendment, articles of reduction and stock issuance statement, all of which were sworn to by the appropriate official of the company and filed with the State Tax Commission of Maryland following the meeting of December 15th, 1932, the statement was erroneous as to the actual vote that was taken at that meeting. These documents stated that the vote which was taken in favor of the action reported was in excess of two-thirds of *each* class, that is, of the "A" and "B" stock, when, as a matter of fact, the actual vote was not in excess of two-thirds of *each* class, although it was in excess of two-thirds of the outstanding shares of the "A" and "B" stock, considered as a *single* class.

The secretary of the company gave the following explanation for this inconsistency: At the meeting, there were a large number of proxies as well as a number of stockholders who attended in person. The first tabulation of the voting indicated that the action as reported was voted for by two-thirds of Class "A" stockholders and also by two-thirds of Class "B" stockholders, tabulated separately. Upon review, however, of the tabulation about a week later, after the secretary had returned to the Dayton office of the company, he found that, as a matter of fact, while there was a favorable vote by more than two-thirds of the Class "B" stockholders, such vote by the Class "A" stockholders did not exceed 62%, that is, it was less than two-thirds. He then undertook to apprise counsel of the error in the original tabulation, but meanwhile the formal documents, fully executed, containing the erroneous statement, had been placed in counsel's hands, who had, in turn, filed them with the State Tax Commission of Maryland. The secretary thereupon suggested to counsel that under the circumstances it was probably appropriate to file an amendment to the documents, but the secretary was advised by counsel that such did not seem to be necessary because, although the statement in the documents was not strictly correct, the vote had, in fact, been more than enough to satisfy all legal requirements under the Maryland law and under the charter, and thereupon the question of filing an amendment was dropped.

Since it is true that both the Maryland law and the company's charter expressly provided, as shown by provisions hereinafter quoted, that notwithstanding a stated requirement for any action to be taken or authorized by the affirmative vote of the holders of a majority or other designated proportion of the shares of each class, such action shall be effective and valid if taken or authorized by vote of the majority of the board of directors together with the vote of the holders of two-thirds of the outstanding shares of the different classes *considered as a single class,* we conclude that no importance attaches to the error in the statements as filed, particularly since there is not the slightest evidence that there was any intentional misrepresentation. While it would have been better to have corrected the mistake on the records of the Tax Commission after it was discovered, the failure to do so may properly be treated as an error of judgment only on the part of counsel rather than on the part of company officials, and not fraught with any bad intent; and since the correction would not have altered the legal effect of the meeting, it is idle to attempt to make the mistake appear as other than an entirely inadvertent, inconsequential one.

*The authority by statute and charter for the corporate action taken.* An examination of the Maryland corporation law makes it clear that complete statutory authority existed, at the time, for taking the corporate action with respect to the company's recapitalization that was taken. Section 28 of Article 23 of the Maryland Code in force at the time when the company was formed, specifically authorizes amendments "changing the terms of" outstanding stock where there is "a reservation in the charter of the right to make such amendment." So much of this section as is pertinent to the present inquiry provides as follows: "Every corporation of this State, heretofore or hereafter incorporated, may from time to time and in the manner hereinafter provided, amend its charter and thereby accomplish any one or more of the following objects:

\* \* \* \* \* \* \*

the classification or reclassification of all or any part of the capital stock; and the mak-

ing of any other amendment of the charter that may be desired, provided that such amendment shall contain only such provisions as it would be lawful or proper to insert in an original certificate of incorporation made at the time of making such amendment. No amendment of the charter of a corporation shall be valid which changes the terms of any of the outstanding stock by classification, reclassification or otherwise, in the absence of a reservation in the charter of the right to make such amendment, unless such change in the terms thereof shall have been authorized by the holders of all of such stock at the time outstanding, by vote at a meeting or in writing with or without a meeting; and in the case of any such change of terms of outstanding stock, the articles of amendment shall, in addition, to other matters required by law, affirmatively set forth that the holders of such stock have duly authorized such change of terms. The word 'terms' as used in this section in reference to stock is intended to mean only the contract rights of the holders thereof as expressed in the charter and shall be so construed." Also, Section 23 of Article 23 (Supp.1935) provides that the charter may authorize any such action to be taken by the affirmative vote of a majority of all the shares of all classes of stock in the *aggregate* outstanding and entitled to vote thereon. Article 7th of the charter of the company as originally filed, and pursuant to which all of the company's stock had been issued, expressly provided, upon the vote of a majority of the board of directors and of the holders of two-thirds of the outstanding shares of the common "A" stock and the common "B" stock considered as a single class, for "one or more additional classes of stock, with such designations, preferences, voting powers, restrictions and qualifications as may be determined or authorized by such vote, which may be the same as or different from the designations, preferences, voting powers, restrictions and qualifications of the classes of stock of the corporation then authorized or issued and outstanding, * * *".

Clearly, this right to issue such new class of stock formed a part of the *contract* with every stockholder of the company, and could be exercised provided the prescribed number of favorable votes was obtained. Furthermore, Article 11 of the charter read as follows: "Notwithstanding any provisions of law now or hereafter in effect requiring any action to be taken or authorized by the affirmative vote of the holders of a majority or other designated proportion of the shares or of the shares of each class, or otherwise to be taken or authorized by vote of the stockholders, such action shall be effective and valid if taken or authorized by vote of a majority of the Board of Directors, together with the vote of the holders of two-thirds of the outstanding shares of the Common A Stock and the Common B Stock, considered as a single class, except as otherwise provided in the Charter." Thus, it will be seen that Articles 7 and 11 of the charter, the latter article being, in effect, a repetition of the provision of Section 23 of Article 23 of the Maryland law above referred to, authorized the adoption of the amendments by the combined vote of the holders of two-thirds of the shares of the "A" stock and of the "B" stock outstanding and entitled to vote, considered as a single class. Such vote was actually received and, therefore, the action taken was entirely in accordance with the statutory and charter requirements.

Plaintiffs, however, contend that such is not true, since the recapitalization plan included the cancellation of accrued dividends on the "A" stock. Such, it is alleged, was not authorized by the terms of the statute or by the reservation in the company's charter just referred to; and that, therefore, such could be validly accomplished only by unanimous consent of the stockholders affected. This precise question, as affected by the Maryland statute, has apparently never been decided or considered in a reported decision of the Maryland Court of Appeals, and also, as far as we are aware, this is the first time it has been before a Federal Court, although the same question, as affected by the statutes of some other States, has been the subject of considerable litigation in those other jurisdictions, notably New York, New Jersey and Delaware, and has been decided favorably to the dissenting stockholders. However, since the statutes of those other States are less broad than the Maryland statute, the decisions in those States are not controlling here. See especially Breslav v. New York & Queens Electric Light & Power Co., 249 App.Div. 181, 291 N.Y.S. 932; Id., 273 N. Y. 593, 7 N.E.2d 708; Morris v. American Public Utilities Co., 14 Del.Ch. 136, 122 A. 696; Keller v. Wilson & Co., Del.Sup., 190 A. 115; Lonsdale Securities Corporation v. International Mercantile Marine Co., 101 N.J.Eq. 554, 139 A. 50; but see Harr v. Pioneer Mechanical Corp., 2 Cir., 65 F.2d

332, certiorari denied 290 U.S. 673, 54 S.Ct. 92, 78 L.Ed. 581. See also 1 Md.Law Review 254.

As we have seen, the Maryland statute expressly authorizes the insertion, by amendment, of any provision that might, at the time of the amendment, have been inserted in an original certificate of incorporation. Clearly, the disputed provision is of such type. Further, the Maryland statute. expressly authorizes any amendment "which changes the terms of any of the outstanding stock by classification, reclassification or *otherwise*" (italics inserted); defines the word "terms" as meaning contract rights of stockholders under the charter; and the unanimous consent requirement of the statute is expressly made inoperative when the charter contains an appropriate reservation, which the charter before us does contain. Thus, whether we treat as vested or not—see Harr v. Pioneer Mechanical Corp., supra—the right to accrued dividends, it is unquestionably a preferential "contract right," and, therefore, is embraced within the express provision of the Maryland statute defining the rights that may be abrogated, and in what manner.

■ The circumstances which led up to the recapitalization refute any conspiracy to deceive or to injure the "A" stockholders, or to unfairly destroy or modify valuable potential rights which they as stockholders had with respect to the assets and earnings, and to share in the administrative control of the company. Of the 400,000 originally authorized issue of "B" shares, 204,328, that is, more than a majority were issued to Frederick B. Patterson, son of John H. Patterson, the founder of the business, who died in 1922. Thereafter, Frederick B. Patterson transferred these shares to a personal holding company of which he owned all the stock, known as the Far Hills Company. Thus, until the stockholders meeting of 1932, this stock was entitled to elect a majority of the board of directors who, in turn, pursuant to the by laws, elected the principal officers of the company, with the result that less than 13% of the company's entire capital stock so held by a personal holding company was in a position to control the company and its policies.

In the fall of 1931, Mr. Edward A. Deeds, who had been executive head of the company under Mr. John H. Patterson but had severed his connection with it in 1916, suggested an elimination of the two classes

of stock, but no concrete action was then taken. The desirability of such a change was accentuated by the fact that some time in 1930 Mr. Frederick B. Patterson had, through his control of the Far Hills Company, caused the 204,328 "B" shares to be pledged with his sister, Mrs. Judah, who had threatened to dispose of the stock to unfriendly interests. The situation was further aggravated by the fact that the stock of the Far Hills Company itself, which owned the equity in these "B" shares, had been transferred by Mr. Frederick B. Patterson in November, 1932, to his wife, for a valuable consideration. There is no evidence whatsoever that the proposal to eliminate the "B" shares and the creation of a single class of common stock originated with the "B" stockholders or their representatives. Likewise, it is uncontradicted that Mrs. Patterson and Mrs. Judah were not interested when this plan was first proposed in the fall of 1931; that the Board of Directors of the company that proposed it had been elected at the annual meeting in April, 1932, at which the "A" and "B" shares had equal voting rights, and that of the eleven directors on that Board, only two, Messrs. Allyn and Haswell, held any "B" stock. Deeds had a personal interest in the "A" stock only. Neither Patterson, Mrs. Judah, Allyn nor Haswell can be said to have conspired to defeat the interests of the "A" stockholders, because the uncontradicted evidence is to the effect that they were not in favor of the plan, and that real difficulty was experienced in obtaining their acquiescence.

In substance, the primary argument of plaintiffs is, as has already been explained, that dividends, erroneously stated as amounting to approximately $7,000,000 but actually amounting to $5,801,250 would, had the plan not gone through, been payable on the class "A" stock, before any could be paid on the class "B" stock; that it was improbable that dividends on either class would be paid; and that, when this arrears of dividends on the "A" stock was written off and there was issued, in lieu thereof, "A" shares equal to 20% of the "A" shareholders' holding at that time, this was in fraud of their interests. We have already fully indicated why we believe what was done was of a character permitted both by statute and by the company's charter. Now let us consider what, by virtue of the new capital structure, the class "B" stockholders lost, and what, if anything, the class "A" stockholders gained.

Class "B" stockholders lost (1) the right to receive dividends at the rate of $3 after the payment of similar dividends on the class "A" stock, and thereafter to share equally with the "A" stock; (2) voting control when payment of dividends on the "A" stock was not in arrears; and (3) an interest in somewhat less than one-fourth of the assets of the company upon dissolution, without regard to any dividends accumulated and unpaid on the "A" stock, in return for which they received approximately a one-eighth interest in dividends, distribution on dissolution and voting power. On their part, the "A" stockholders had their interest in the assets of the company proportionately increased by (a) the distribution of the 238,000 shares of "A" stock, and (b) by the substitution of 200,000 shares of "C" stock for the 400,000 shares of "B" stock. In other words, before these changes took place, the "A" stock represented less than 75%, and the "B" stock represented more than 25% of the total outstanding stock of the company; whereas, after these changes had taken place, and after all the stock had been merged into one single class of common stock, the stock represented by the holdings of the former "A" stockholders constituted 87% of the total, and the holdings of the former "B" stockholders less than 13%. Furthermore, prior to the new capitalization, the "B" stock participated equally with the "A" stock, share for share, on dissolution, irrespective of unpaid dividends on the latter; and in the absence of dissolution, if there were no arrears in dividends on the "A" stock, the "B" stock was entitled to $3 per share before any further payment could be made on the "A" stock; and the "B" stock participated equally in any additional dividends, as well as being entitled to control of the company. On the other hand, after the changes took place, the common stock represented by the holdings of the former "A" stockholders was entitled to 87% of all dividends declared under all circumstances and the holders of this stock controlled the election of directors and thereby the entire management of the company. Therefore, it is a direct contradiction of the true state of affairs to say that the "A" stockholders were not actually benefited by the changes that took place as a result of the new capital structure.

■ Another group of persons acting as directors under precisely the same circumstances might have voted to recommend a different plan to their stockholders. Further, it may be assumed that such plan—indeed several different plans—might have been fair and feasible, and perhaps more favorable to the "A" stockholders. However, this proves nothing from the legal aspect. It is not the function of a court of equity to attempt to substitute its judgment for that of the persons who are lawfully in control of a corporation's affairs, once it has determined that their conduct is neither ultra vires, fraudulent, illegal, nor grossly negligent. See Shaw v. Davis, 78 Md. 308, 28 A. 619, 23 L.R.A. 294; Matthews v. Headley Chocolate Co., 130 Md. 523, 100 A. 645; Homer v. Crown Cork & Seal Co., 155 Md. 66, 141 A. 425.

■■ The validity of the issuance of the 238,000 "A" shares is not open to question by the present plaintiffs because, as determined by this court's previous decision, of the absence of the holders of those shares as parties to this proceeding. Parenthetically, however, we point out that the issuance of this stock was duly and fully noted to stockholders, and its issuance was effected by the requisite vote. It was merely a split-up that was entirely consonant with the Maryland corporation laws and the charter of the company. See Public Service Commission v. Consolidated Gas Electric Light & Power Co., 148 Md. 90, 129 A. 22.

■ Likewise, the reduction in the amount of the total issued capital stock which resulted from the plan or recapitalization was fully authorized by law, and adopted by vote which was in accordance therewith. The amount of issued capital stock has no inherent relation to the value of the assets of the company issuing the stock. That is to say, an increase or decrease in the amount issued has necessarily no bearing upon the actual value of the shares of stock, or of the value of the assets behind those shares. Thus, the reduction which took place in the present case involved no parting with assets. This is demonstrated by the simple example suggested by counsel for the company, namely, if the company had been liquidated on December 14th, 1932, that is just prior to the meeting of stockholders or on December 20th, 1932, when the articles of reduction became effective, the amount of assets available for distribution to stockholders would (except, of course, for changes in the ordinary course of business) have been the same on either date; the "worth" of the company not being affected in any

sense by this corporate procedure. The reduction in the capital stock merely created a capital surplus against which proper charges might be made. It was not used as a source of dividend payments.

Since we find that the 1932 recapitalization plan was both authorized by the necessary vote of stockholders, and carried out in entire accordance with the law, it becomes unnecessary to give more than passing consideration to the point, also stressed by defendants, that even though there had been irregularities in the action taken, the relief now sought cannot be granted in the very nature of things. It is contended that all stockholders, other than the plaintiffs, are barred by delay and the acceptance of dividends under the recapitalization; that the plaintiffs themselves are barred by their own laches, by their failure to return the "A" stock received by reason of the split-up, and by their absence of good faith; and that all stockholders, including the plaintiffs, have, by their delay, followed by the. changes in ownership that have taken place with respect to the stock here in issue, contributed toward bringing about a situation in which a court of equity is without power to grant any relief. But, as just stated, it becomes unnecessary to rest our decision upon any of these grounds, tenable though they may be.

### The Deeds Option.

We now turn to a consideration of the second feature of the case, namely, the option given to Edward A. Deeds which is attacked by the plaintiffs on grounds which may be summarized as follows: (1) That it was granted in violation of the requirements of the Maryland law and the company's charter; and (2) that it was the result of an unlawful conspiracy in derogation of stockholders' rights and that, if not annulled, will result in waste or spoliation of the company's assets.

The option agreement is dated September 16th, 1932, and was given to Edward A. Deeds pursuant to a resolution adopted by the company's board of directors, at a meeting held on April 22nd, 1932, after having been duly called. About a year and a half prior to the time it was given, Mr. Deeds had been re-employed by the company, he having been previously associated with it as follows: In 1899–1901 as plant engineer, at the age of 25. After an absence of about two years, during which he was engaged in plant designing and management for the Shredded Wheat Company, he returned to the National Cash Register Company as second assistant general manager, that is to say, third in command, Mr. John H. Patterson, the founder, being president and general manager, and Mr. Roy Chalmers, first assistant general manager. In this latter capacity he remained with the company until 1915, becoming, in 1909, after Mr. Chalmers' resignation, first assistant general manager. While retaining the title of president and general manager, Mr. John H. Patterson put Colonel Deeds to a very large extent in control of the entire affairs of the company, and for the three or four years immediately preceding his leaving the company, which he did in 1916, Colonel Deeds was being paid a salary of $72,000 a year. Concurrently, he devoted a large amount of time and effort to the development of the Delco Company, and related businesses, and this fact, plus the fact that, following the very disastrous flood in the Miami Valley in 1913, he had accepted appointment as president and director of the Miami Conservancy District, led to his resigning his position with the Cash Register Company in 1916.

Summarized, the agreement gave to Colonel Deeds for five years, commencing July 17th, 1932, the option to purchase at $9.80 a share, with interest at the rate of 4% from July 17th, 1932, to the date of payment, all or any part of 50,000 shares of class "A" common stock of the company, or a like number of shares of any class into which this stock might be converted. As to 10,000 shares, the option was exercisable immediately upon its execution. During the year beginning July 17th, 1932, and in each of the succeeding years, an additional 10,000 shares became subject to the option, and it was expressly provided that the option should be cumulative. Subject to certain provisions not material here, it was further provided that the option should become null and void at any time that Colonel Deeds should cease to be either an officer or director of the company. As a result of the recapitalization of the company in 1932, hereinbefore considered, the option was automatically modified so as to increase the number of shares covered by it to 60,000, and the option price per share was correspondingly reduced.

Colonel Deeds first exercised the option on December 26th, 1933, when he purchased 24,000 shares. The same number were

purchased on August 30th, 1935, and the remaining 12,000 shares on July 31st, 1936. The total amount paid to the company represented the actual cost of the shares to it, plus interest less dividends declared on the stock, and plus the sum of $130.32 representing profit to the company. Colonel Deeds still holds all of the stock.

■ Taking up the first contention of the plaintiffs above referred to, namely, that the option was given in violation of both statutory and charter requirements, one phase of this contention is that the shares covered by the option agreement were acquired by the company out of its capital, reliance being had upon Article 23, § 50, of the Maryland Code (Supp.1935), which forbids the purchase by any domestic corporation of its own shares, unless its assets remaining immediately after such purchase shall be not less than the debts of the corporation, plus the amount of its issued capital stock, and which further provides that if any such purchase or redemption is made, those receiving payment therefor shall be liable to the corporation or its receiver for its debts existing at the time of such payments. However, there is no evidence that there was any impairment of the company's capital, and we find nothing in the provisions of the Maryland law above summarized, or in any other provisions, or in the company's charter, which prohibits the purchase and sale by the company of its own shares, provided such is done for legitimate, corporate purposes. We further find that the steps incident thereto, both with respect to action by directors and stockholders, have been in full compliance with the legal requirements.

Section 50(3) of Article 23 of the Maryland Code in effect at the time provides that a corporation "may purchase shares of its own stock of any class out of its surplus," if authorized so to do either (1) by its charter, or if not by its charter, then (2) by holders of two-thirds of its shares. Section 50(4) provides that any of its shares acquired by purchase, "unless acquired for retirement, may be held by such corporation or sold or otherwise disposed of by it from time to time for its corporate purposes." Paragraph Third 10(d) of the company's charter provides that the company shall have power "to purchase or otherwise acquire, hold, sell, convey or assign, pledge, transfer, or otherwise dispose of, and to reissue, any shares of its own capital stock (so far as may be permitted by law) * * * upon any terms and in any lawful manner." See Reed & Fibre Products Corporation v. Rosenthal, 153 Md. 501, 138 A. 665. As explained in that case, by this statutory provision it became valid and lawful for a corporation to do what had been previously unlawful, namely, to purchase shares of its own stock, provided it was authorized to do so by its charter, as is the case here, or by the vote at a meeting duly called and held of the holders of two-thirds of the shares of each class of stock outstanding.

■ Another argument advanced in support of plaintiffs' contention that the option agreement violates statutory and charter provisions is that it was given without consideration. However, we find this contention also to be unsupported by the facts. The consideration was the promise which Colonel Deeds made to assume the position of chairman of the board of directors and of the executive committee of the company, and to undertake the duties incident to those offices.

■ Again, it is contended that the option agreement is invalid because in violation of Article 23, § 41(6), of the Maryland Code (Supp.1935) which prohibits the issuance of stock for future services. However, in the present instance, there was no *issuance* of stock for such services, but merely the application of stock already issued and held in the treasury of the company. Such is not prohibited. See France, Principles of Corporation Law, 2nd Ed. Sec. 94. Furthermore, the option was not, in fact, an agreement for the *delivery* of stock for *future services* in the general acceptation of the words "future services," but was, in fact, a contract providing for the *future delivery* of stock, if and when the rendering of particular services had periodically been completed. That is to say, at the time when the agreement was actually entered into, Colonel Deeds had been serving for sixteen months, and, therefore, as to 10,000 (subsequently increased to 12,000 by the stock split-up) the option was exercisable immediately for completed services. Likewise, in each of the four succeeding years, an additional 12,000 shares became subject to the option, in consideration of services over like periods. As a matter of fact, there is no prohibition in the Maryland corporation law against the future *issuance* of stock upon the completion of services to be rendered. See Mas Patent Bottle Corp. v.

Cox, 163 Md. 176, 161 A. 243; Reed & Fibre Products Corp. v. Rosenthal, supra.

Turning again to the charter of the company, the plaintiffs contend that the option agreement violated paragraph 17 which authorizes the company to establish "a plan or plans for profit-sharing under which officers and employees as such, by bonuses or in other form of distributions, shall share in the profits of the corporation," but prohibits the establishment of any such plan except upon vote of a majority of the board of directors, and of two-thirds of the outstanding stock considered as a single class, voting at a meeting called for that purpose.

We find that this provision has no application, either by its language or by reasonable implication, to the present situation. If it be held to apply this would be tantamount to saying that the corporation was forbidden, without complying with the provisions of this paragraph, to make separate agreements with individual officers by way of compensation for their services whenever such agreement contemplated part payment in stock of the company, although, as we have just seen, this form of payment is elsewhere authorized in the company's charter and by the Maryland law. It may be that if the company were adopting a plan common to its officers or employees, or to certain groups of its officers or employees whereby they would be given a right to subscribe, under certain conditions and over a certain period of time, to the company's stock, such might be considered as a "form of distribution" whereby such officers or employees would "share in the profits of the corporation," although this question we do not have to decide. We interpret paragraph 17 as contemplating by the language employed, the granting of something in the nature of a gratuity or bonus for past services, and that to more than one officer or employee, neither of which conditions exists in the present case.

Turning to the second contention of the plaintiffs above stated, namely, that the granting of the Deeds option was the result of an unlawful conspiracy on the part of its dominating directors, in derogation of the rights of the company's stockholders which, if not terminated, would result in waste or spoliation of the company's assets, we find that it, also has no basis in fact. Throughout the bill of complaint, and the arguments and briefs of counsel for the plaintiffs, is a constant, vituperative repetition of the contention that the option was part and parcel of a carefully concealed, fraudulent conspiracy to divert the assets of the company into the possession of its directors and the "B" stockholders, as part of the 1932 recapitalization. We agree with counsel for defendants that plaintiffs' counsel, in an effort to support this contention, "Has substituted abuse for reasoning and adjectives for record references, and that far from being sustained", it is "directly disproved by the evidence."

As appears from the earlier part of this opinion, we find nothing unlawful or improper in the recapitalization of 1932, or in the methods by which the same was brought about. It is equally true that the Deeds option and the proposed recapitalization were entirely separate and distinct, the former being under consideration by the board of directors long before the latter was formulated, and it was not until long after the option had been formally approved by the board of directors, and more than a month after it had been granted, that the plan of recapitalization was formulated.

Plaintiffs contend that the option agreement is in and of itself fraudulent and a waste or spoliation of the company's assets because at the time it was effective, Colonel Deeds was receiving from the company a salary of $100,000 a year; that this salary in itself was exorbitant, and that to add anything to it, such as the right to purchase the company's shares even though such right might be of speculative value, depending upon the future prosperity of the company, was in and of itself utterly wasteful and a contradiction of the contention that it was supported by valuable consideration. Also, the point is emphasized that in addition to receiving the allegedly exorbitant salary from the company, he received, for three or four years after his reassociation with it, $50,000 a year from the General Sugar Company (later the Vertientes-Camaguey Sugar Company), as its president, and $36,000 from the Niles Bement Company as chairman of its board; that he never disclosed to the other officers and directors of the National Cash Register Company that he was so employed, and that this pyramiding of employment in high places caused him to give far less time

and effort to the Cash Register Company's affairs than he had impliedly, if not expressly, agreed to give, and should have given, and should still be giving. Mr. Deeds' present salary from each of these companies is $25,000 a year.

First, it should be stated that there is nothing in the record to indicate that Colonel Deeds concealed or in any way misrepresented the character or extent of his connection with any other companies or the compensation that he was receiving from them. While it is true the record does not disclose that his salaries from the two companies above referred to, admittedly large, were specifically discussed with him by members of the board of the Cash Register Company, the record is replete with evidence that his other business connections were discussed, and indeed, it was because of the other important executive positions which Colonel Deeds held that the board of the Cash Register Company felt that he was all the more to be desired.

 Plaintiffs' contention is in effect that the option agreement with Deeds has amounted to an excessive bonus payment having no relation to the value of the services for which it was stated to be given— that it was in reality a gift, and that the majority stockholders and a fortiori the directors, have no power to give away corporate property against the protest of the minority. That neither majority stockholders nor directors have such power of gift is a correct statement of the law. Rogers v. Hill, 289 U.S. 582, 591, 592, 53 S.Ct. 731, 77 L.Ed. 1385, 88 A.L.R. 744; Wight v. Heublein, 4 Cir., 238 F. 321; Koplar v. Warner Bros. Pictures, D.C., 19 F.Supp. 173; Matthews v. Headley Choc. Co., 130 Md. 523, 100 A. 645; Seitz v. Union Brass & Metal Mfg. Co., 152 Minn. 460, 189 N.W. 586, 27 A.L.R. 293. See also Ransome Concrete Machine Co. v. Moody, 2 Cir., 282 F. 29; Presidio Mining Co. v. Overton, 9 Cir., 261 F. 933; Francis v. Brigham-Hopkins Co., 108 Md. 233, 70 A. 95. But the facts here are not as claimed.

 The rule that must control in the present situation is succinctly stated in Wight v. Heublein, supra, a decision of the Fourth Circuit Court of Appeals, as follows, 238 F. page 324: "It is obviously not the province of a court of equity to act as the general manager of a corporation or to assume the regulation of its internal affairs. If the chosen directors, without interests in conflict with the interest of stockholders, act in good faith in fixing salaries or incurring other expenses, their judgment will not ordinarily be reviewed by the courts, however unwise or mistaken it may appear; but this is far from saying that equity will refuse to redress the wrong done to a stockholder by the action or policy of directors, whether in voting themselves excessive salaries or otherwise, which operates to their own personal advantage, without any corresponding benefit to the corporation under their control."

To the same effect is Matthews v. Headley Chocolate Co., supra, the court there saying, 130 Md. at page 535, 100 A. at page 650: "The court would not be authorized to substitute its judgment for theirs [the directors] as to what are proper salaries, provided they acted in good faith within their powers, and the salaries fixed by them were not clearly excessive."

In Seitz v. Union Brass & Metal Mfg. Co., supra, it was said, 189 N.W. at page 587: "If the officers, acting as they do in a fiduciary capacity, fix exorbitant and unreasonable salaries so as to absorb earnings which should go in dividends or remain with the company as surplus, they are not exercising the fidelity which the law requires and a court of equity will give relief at the suit of a minority stockholder by compelling restoration. In determining whether salaries are so excessive and unreasonable that there should be a restoration, courts proceed with some caution. An intolerable condition might result if the courts should too lightly undertake the fixing of salaries at the suit of dissatisfied stockholders. An issue as to the reasonable value of the services of officers is easily made. It is not intended that courts shall be called upon to make a yearly audit and adjust salaries. The dissenting stockholder should come into court with proof of wrongdoing or oppression, and should have more than a claim based on mere differences of opinion upon the question whether equal services could have been procured for somewhat less. Were it otherwise efficient executives, able to command in competition large salaries, risking their capital on the faith of control and a steady employment, would find themselves and their capital periled by the uncertain view which a court might take. The right of majority control must be given effect,

and the minority cannot, through the courts, interfere with an honest and fair majority policy."

A review of Colonel Deeds' record and achievements, including his earlier services with the company, satisfies the court that the situation presented is not one which this court should undertake to disturb. At the time the option was given, Colonel Deeds appears to have attained a position in the industrial world which apparently enabled him to name his own price. The board of directors apparently thought that his services were indispensable to the future prosperity of the company. There is a good deal to justify this conclusion, but whether it be entirely sound or not is beside the sole question which this court is permitted to rule upon, that is, whether the cumulative option to purchase, at cost to the company, with interest at the rate of 4% to date of payment, 10,000 shares of its treasury stock during each year of his services as chairman of its board and of its executive committee, which the directors agreed Colonel Deeds should have as supplementary to his salary of $100,000 a year, was so exorbitant as to preclude a finding of good faith and to amount to waste of the company's assets on the part of the directors in making such an agreement.

The National Cash Register Company is the largest manufacturer of cash registers and accounting machines in the world. It produces approximately 90% of all such devices manufactured in the United States. It has a place of business in practically every large city in this country, and in nearly every other civilized country, employing in all, approximately 18,000 people. It has factories in Dayton, Ohio, Germany and Japan. For the year 1937, its gross sales were in excess of $51,000,000. Its shares of stock are owned by approximately 19,000 persons. John H. Patterson, founder of the company, died in 1922, and was then succeeded as president and chairman of the board by his son, Frederick B. Patterson. Under him was a general manager, Mr. Barringer and a sales manager, Mr. Steffey, who were paid at the rate of $150,000 and $72,000 a year, respectively. Mr. Patterson was then receiving $144,000 a year.

In 1931, during the depression, dissatisfaction arose with these officials, resulting in their resignation in the same year. At that time, the board of directors of the company consisted of eleven members, of whom the holders of the "B" stock were entitled to select six, and the holders of the "A" stock the remaining five. A majority of the so called "B" directors were executive officers of the company. These "B" directors, at the invitation of the "A" directors, recommended that Colonel Deeds be re-employed to manage the company's affairs. His previous association with the company has already been set forth in this opinion. In 1916, when he severed his connection with the company, he had been paid a salary on the basis of $72,000 a year, although devoting only approximately one-half of his time to the business of the company, and earning, in addition, in excess of $100,000 from other industrial enterprises with which he was connected.

Colonel Deeds' availability was investigated in 1931. He was interviewed by two of the "B" directors, Messrs. Patterson and Kuhns, president and secretary, respectively, of the company. Following various conferences between some of the "B" and the "A" directors, a meeting of the board was had on May 14th, 1931, after being duly called, at which meeting a committee of three directors was appointed and given authority to offer to Colonel Deeds a salary of $100,000 a year, together with some form of participation in the stock of the company. After the committee had conferred with Colonel Deeds, he agreed to accept at the salary mentioned, with the understanding that the matter of additional compensation in the form of stock purchase would be later determined. On May 15th, 1931, the board of directors held a meeting and elected Colonel Deeds chairman of the board and of the executive committee. At this meeting the special committee, heretofore referred to, reported that an understanding had been reached with Colonel Deeds with regard to his compensation to the effect that it "should be at the rate of $100,000 for the current year, with the further understanding that the committee would recommend that a plan for additional compensation be submitted to the board at a later date, but with no definite commitment as to the action of the Board thereon."

Although at a subsequent meeting of the board, held on July 17th, 1931, it appears that a special committee was again appointed for the purpose of giving consideration to the matter of additional compensation to Colonel Deeds; and although

It further appears that this committee met, no report was made or action taken by it. Finally, at a meeting on April 22nd, 1932, following the stockholders annual meeting which was the first meeting of the newly elected board of directors, the matter was brought to a head through the adoption of a resolution approving a plan of additional compensation to Colonel Deeds, embodying the purchase by the company of 50,000 shares of its common "A" stock, and the granting to Colonel Deeds of the option to purchase this stock at an average cost price, in installments over a period of five years. The chairman of the board was authorized to appoint a committee of three to work out the details of the arrangement, with power to act, and the executive officers were authorized to execute on behalf of the company a contract in the form recommended by the committee. All members of the board of directors who were present—nine in number—voted for this resolution, except Colonel Deeds, who did not vote. Two absent members at a subsequent meeting also approved the action taken. Instructions were then given to the firm of Dillon-Reed & Company to purchase, on the open market, 50,000 shares of the company's "A" stock and it was paid for by the treasurer of the company, costing $489,869.58. These payments were completed in August, 1932, and on September 16th of the same year, the option agreement, after preparation by the company's counsel, was formally executed.

There was an effort on behalf of the plaintiffs to make much of the fact that Colonel Deeds gave only part of his time—approximately four days a week—to the Cash Register Company. This is stressed as further evidence of the excessive character of his salary of $100,000, apart from the additional compensation that he was receiving, and the value to him of.the option agreement. However, Colonel Deeds had, in the course of his previous connection with the company, served on a part time basis, in fact, was only giving one-half of his time to the company, and yet its directors then felt, although his prominence and reputation were not ` as fully established as they were in 1932, that his services were worth $72,000 a year. It is to be noted that this court is not now being asked to void or to reduce the present salary to Colonel Deeds. In fact, if such relief were sought, this court, in the present proceeding which is one in rem, would be without

jurisdiction to grant it. However, the alleged excessiveness of this salary is stressed as an argument that since, as contended, Colonel Deeds is already greatly over-paid by reason of this and his additional compensation from other companies, a fortiori he should not be allowed *any* opportunity to profit further from the company.

 It may be conceded that, prima facie, judged by appropriate standards of the worth of the services of any individual for any particular industrial executive position, a salary of $100,000 a year appears to the average person, of average business experience and responsibilities, to be more than liberal compensation. However, courts are not permitted to be controlled by this test any more than by what the average judge, familiar with cases of the present kind, might himself conclude to be adequate compensation. We must distinguish between compensation that is actually wasteful and that which is merely excessive. The former is unlawful, the latter is not. The former is the result of a failure to relate the amount of compensation to the needs of the particular situation by *any* recognized business practices, honestly, even though unwisely adopted,—namely, the result of bad faith, or of a total neglect of or indifference to such practices. Excessive compensation results from poor judgment, not *necessarily* from anything else. If the rule were otherwise, the result would be destruction of autonomy in private enterprise to a degree that would render such enterprise no longer private; personal initiative and its just rewards would disappear, and this would undermine the very basis upon which our economic life, with its constitutional guaranties, is founded, and upon which our democratic form of government depends. Of course, directors should not be permitted to abuse the power that is entrusted to them by the stockholders. The stockholders, in the very nature of things, must vest in the directors a vast amount of discretion in matters of this kind, and often cannot, without the aid of the courts, prevent or remedy abuse of this discretion. But whether there has actually resulted such abuse as will justify the intervention of a court, depends upon all the facts and circumstances in each particular case, and what may well be considered an abuse in one instance would, of course, not be so in another. As was said in Koplar v. Warner Bros. Pictures, supra, 19 F.Supp.

at page 188: "Directors have the power to award just compensation. That power should be used, not abused. Fair human requirements should set some limits to salaries. Extraordinary talent is not acquired. If it were, it would not be extraordinary. Doubtless it is an endowment which the holder should not place on the auction block."

What the point would be beyond which, in the present case, payments in any form might properly be said to amount to a clear abuse of the discretion vested in directors, and to amount to waste, we are not called upon to decide. Suffice it to say we are not satisfied that it has been over-stepped in the present case as a result of the option to Colonel Deeds. At the same directors' meeting at which the option was authorized, the president of the company, Mr. F. B. Patterson, was voted an annual salary of $115,200; and the plaintiffs have introduced no evidence of corresponding compensation paid by other large corporations, indicating that what Deeds was voted was greatly in excess of that paid in other cases. Furthermore, it is to be borne in mind that the acceptance of this option by Colonel Deeds was in no sense a guaranty of profit in any amount. On the contrary, there was inherent in the agreement a large element of speculation. Colonel Deeds assumed the risk of loss— loss of a very substantial character. He paid approximately $490,000 for the shares under the option agreement. Since the purchase the market price of the stock is stated to have been as high as $38 a share. 50,000 shares at this price would be $1,-900,000, or a profit of $1,410,000 over the cost to Colonel Deeds, on the assumption that he might have disposed of the stock at this figure, or that it may ultimately be that high or higher, again. However, the stock has been subject to great fluctuation and the latest quotations put in evidence in the case (those for June, 1938) show that while it reached a high of $20\frac{7}{8}$ per share, it reached a low of $15\frac{1}{2}$, and that in 1933, at the so-called peak of the depression, it went as low as $5\frac{1}{8}$. It is reasonable to assume, as the directors intended, the rise or fall of the company's stock would reflect Colonel Deeds' ability to transform a large net operating loss into a much larger net operating profit. This he has apparently done—at least this result has occurred, and as executive head of the company he, first and foremost, is entitled to credit for this accomplishment.

Throughout the extended depression that has affected all industry for the past seven or eight years, the uncontradicted evidence is that under the management of Colonel Deeds the company's business has been running considerably ahead of the general trend of business in this country. In 1935 the Board of Directors apparently attributed this fact largely to Colonel Deeds' executive ability because in that year he was made president, as well as chairman of the board, and the former president, Mr. F. B. Patterson, became vice-president. Colonel Deeds' salary was not, then, nor has it since been, increased. Mr. Patterson's salary was then decreased to $60,000, and subsequently to $25,000, where it remains.

A resume of the net earnings of the company, in round figures, will be further illustrative and corroborative of the position now taken by this court. The net earnings of the company from 1925 to 1937, inclusive, were as follows: 1925 in excess of $6,000,000; 1926 in excess of $6,500,000; 1927 slightly more than $7,000,-000; 1928 in excess of $7,500,000; 1929 in excess of $8,000,000; 1930 in excess of $3,-500,000; 1931 slightly more than $800,000; 1932 net operating loss of approximately $3,400,000; 1933 net operating loss of almost $600,000; 1934 net earnings of $1,-000,000; 1935 net earnings of $1,500,000; 1936 net earnings of almost $3,000,000, and 1937 of almost $4,000,000.

Finally, it should be noted that the company's annual report for the year ending December 31st, 1932, which was sent to every stockholder, contained a detailed explanation of the terms of the option agreement with Colonel Deeds and the reason for its execution, and plaintiffs admit receiving such copy. Also, the letter to stockholders which the plaintiffs received dated November 19th, 1932, in regard to the proposed recapitalization of the company, made specific reference to the option, in the consolidated balance sheet which accompanied this letter. In spite of these facts, the plaintiffs waited until July 19th, 1934, that is, for approximately a year and a half, before challenging the validity of the option. It is not a sufficient excuse to say that they were not apprised of relevant facts, namely, the amount of the regular salary that Colonel Deeds was receiving from the company, and of the other salaries received from other corporations. There is no evidence that information in this respect was ever

sought by the plaintiffs or refused by the company. In the absence of such refusal, obviously the officers and directors of the company cannot be charged with any attempted concealment.

Colonel Deeds still holds all of the stock acquired under the option agreement. In short, it has been fully exercised. Indeed, as to 24,000 shares, Colonel Deeds exercised his option and paid for them, before any complaint was made by the plaintiffs. Nor have there been complaints by any of the other 19,000 shareholders, in spite of the fact that the present proceeding was originally instituted more than four and a half years ago.

Since, for the reasons above stated, this Court reaches the conclusion that the plaintiffs' contentions with respect to the Deeds option are without merit, it becomes unnecessary to consider whether, in view of the limited character of this court's jurisdiction in the present proceeding, plaintiffs could, in any event, be accorded the relief sought. The same is true with respect to the relief sought by the plaintiffs with respect to the recapitalization of the company in 1932, which is dealt with in the first part of this opinion.

Accordingly, the bill of complaint as amended must be dismissed in its entirety. A decree will be signed to this effect.